***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioners Berger and Stephenson, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses Deputy Commissioner Stephenson's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant on December 18, 1996.
3. Defendant was self insured with Constitution State Services Company as the third-party administrator on December 18, 1996.
4. Plaintiff's compensation rate was $117.09 per week on December 18, 1996.
5. Plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with defendant on December 18, 1996.
6. Plaintiff's medical records regarding this claim are admitted into evidence as Stipulated Exhibit # 2.
7. The depositions and transcript with respect to the prior hearing in this case on December 16, 1997, and the prior Opinion and Award filed by Deputy Commissioner Berger on June 24, 1998, are admitted into evidence as Stipulated Exhibit # 3.
8. The Commission takes judicial notice of the Form 33 filed June 27, 2000, the Form 33R filed July 7, 2000, and the Form 28B filed September 29, 1998.
9. The issues to be determined are whether plaintiff has sustained a change of condition and, if so, what further benefits is she entitled including, but not limited to, medical benefits.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On December 18, 1996, plaintiff was 37 years old and employed as a stocker with defendant. On that date, she sustained a cervical strain when a stack of boxes fell on her back while she was performing the duties of her employment.
2. Plaintiff treated with Zane T. Walsh Jr., M.D., following her injury. Plaintiff was treated conservatively and Dr. Walsh released plaintiff at maximum medical improvement as to her cervical strain and to return to work with no restrictions in Spring 1997.
3. Plaintiff also treated with James E. Rice, M.D., following the December 1996 injury. Dr. Rice diagnosed cervical strain and determined that plaintiff reached maximum medical improvement as to her cervical strain in June 1997. Dr. Rice released plaintiff to return to work with no restrictions on June 20, 1997.
4. Plaintiff briefly returned to work after being released by Dr. Rice in June 1997. However, plaintiff quit her stocker position with defendant on July 30, 1997.
5. On December 16, 1997, Deputy Commissioner Berger heard plaintiff's case on the issue of entitlement to any additional temporary total or permanent partial disability. By Opinion and Award filed June 24, 1998, Deputy Commissioner Berger determined plaintiff was not entitled to any further benefits and had sustained no permanent disability.
6. At the hearing before Deputy Commissioner Stephenson, plaintiff testified that since June 24, 1998, her condition has worsened. She experiences low back pain and has difficulty getting out of bed in the morning. Plaintiff can no longer do things with her children as she did before. Further, the pain causes her head to hurt and her blood pressure to rise and makes it impossible for her to sleep on her back. Some of her worst difficulty is getting up in the morning, as it can take an hour or more to get out of her bed on certain days. On a good day when plaintiff is able to get out of the bed, she can do a little bit of work around her house, but experiences back pain if she is too active. Plaintiff's pain and discomfort further restrict her daily activities such as driving.
7. When plaintiff's back condition began to worsen, she made the decision to not return to her prior treating physicians, Drs. Walsh and Rice. Plaintiff testified that on her last visit to Dr. Rice, he had spent about five minutes with her, stuck her with a pin, and instructed her to return to work despite her reporting continued pain. As to Dr. Walsh, plaintiff testified that on her last visit he stated that he had nothing to offer her and did not want to see her again. Thus, plaintiff did not want to return to her prior physicians and instead sought treatment elsewhere. In or about October 1998, plaintiff sought treatment for her pain at Womack Army Medical Center, where she was referred to Cape Fear Neurology Associates.
8. On October 15, 1998, plaintiff began her examinations and treatment with Barry White, M.D., of Cape Fear Neurology Associates. Plaintiff complained of neck pain, and pain that radiated into her arm and down her back. Upon examination, Dr. White noted that there was a ten percent (10%) reduction of range of motion in plaintiff's neck and that she had a reduced right radial jerk with decreased muscle strength in her biceps. Sensory testing suggested a dermatomal pattern sensory loss in the C-5/C-6 dermatome. Plaintiff's straight leg raise was slightly restricted in both legs. Dr. White diagnosed plaintiff with a cervical radiculopathy at C-6. He further opined that this would be consistent with plaintiff's work related injury. Further, plaintiff's chronic pain syndrome would be due to centralized pain as a result of the accident. Dr. White scheduled plaintiff for an EMG. Because of plaintiff's then pregnancy he was not able to do much for her, especially when it came to pain medication.
9. Plaintiff returned to Dr. White on May 6, 1999, and was still symptomatic with pain in her right arm and into her neck and shoulder. Dr. White prescribed Neurontin, and referred plaintiff to Dr. Toni Harris for pain management.
10. On September 14, 1999, Dr. White noted that plaintiff remained in significant pain, which he believed to be genuine. Plaintiff continued to complain of neck and lower back pain and difficulty in sleeping. She still had a restricted range of motion and her finger flexion responses in the hands were consistent with plaintiff's cervical EMG findings. At that time, Dr. White believed that plaintiff was approaching maximum medical improvement and rated her with having a permanent partial disability of 20% to her back, with 10% attributed to the neck and 10% to the lower back. Dr. White believed it to be a conservative rating given the fact that plaintiff had a documented radiculopathy.
11. In June 2000, Dr. White noted that plaintiff had a four out of five weakness in her left triceps and biceps and that plaintiff's left grip was slightly weak compared to the right. She also had a depressed left bicep jerk and was tender over her left shoulder. His impression was that she was quite depressed and had severe and chronic neck and low back pain. At that time, Dr. White did not believe plaintiff was capable of working. In addition to the Neurontin already prescribed for plaintiff, Dr. White prescribed Darvocet and Celexa. Dr. White continued to treat plaintiff through early 2001, when he terminated his practice with Cape Fear Neurology Associates.
12. Upon Dr. White's departure, plaintiff began treating with Sampath Charya, M.D., at Cape Fear Neurology Associates on May 23, 2001. Dr. Charya began his treatment of plaintiff with a complete review of her condition. As a result, he ordered an EMG conduction nerve study of her lower back, which was done on June 29, 2001. Dr. Charya's impression was that the study revealed neuropathic changes of long fiber distribution, with non-specific and chronic mild lumbar radiculopathy at multiple levels. He recommended a maximum weight restriction of 10-15 pounds and that plaintiff avoid strenuous activities. Dr. Charya continued to treat plaintiff with medication through the end of 2001.
13. On November 9, 2001, Dr. Charya performed an EMG nerve conduction study of plaintiff's cervical area. This study revealed neuropathic changes of long fiber distribution. He maintained her weight lifting restrictions of 15 pounds and prescribed a trial of antidysesthesia medication.
14. In his deposition, Dr. Charya stated, "when you have a spine with degenerative arthritic changes, aggravation or precipitation of the symptoms post traumatically is a concern that we see over and over again in our clinical practice." He opined that due to plaintiff's December 1996 work related injury, she had post-traumatic neck pain with dysesthetic spasms and neck pain related headaches, and that her pre-existing arthritic spine disease may have contributed to the post-traumatic initiation or aggravation of the symptoms. Further, Dr. Charya stated that plaintiff's present cervical or lumbar spine condition was activated, accelerated, or aggravated by the December 1996 work related injury. Additionally, the doctor stated that plaintiff suffers from a definite permanent disability and the percentage rating to her back would be 15% due to her December 1996 work related injury.
15. Plaintiff was seen by Dr. Walsh on May 1, 2001, for a follow-up examination pursuant to the request of defendant. Plaintiff had last seen Dr. Walsh on April 17, 1997. The follow-up examination was cursory and did not involve any new diagnostic procedures. Thus, Dr. Walsh's opinions in his deposition were based upon his prior examination and treatment of plaintiff as well as the cursory examination of May 1, 2001. At deposition, Dr. Walsh reviewed the conclusions of his March 20, 1997, EMG where he found no evidence of radiculopathy in the neck but a neuropathy at the wrist of the carpal tunnel. However, Dr. Walsh did state that if plaintiff had a diagnosis of cervical radiculopathy now, that such would be a significant change from his findings in 1997.
16. Plaintiff had a similar follow-up examination with Dr. Rice on June 17, 2001. Dr. Rice has neither performed any diagnostic tests nor reviewed any of plaintiff's MRI's or EMG's since March 1997. His impression upon plaintiff's follow-up visit was one of cervical, thoracic, and lumbar strain with contusion. In his deposition, Dr. Rice admitted that plaintiff does experience some pain based on his examination. He testified that if plaintiff now experiences a C5/C6 radiculopathy, such occurrence would be a change in her condition.
17. Based upon the greater weight of the evidence, most notably the testimony and medical records of Drs. White and Charya, plaintiff has shown a change in condition. Plaintiff's cervical radiculopathy, which is proximately related to her work related injury on December 18, 1996, was either not present or went undiagnosed during her prior treatment with Drs. Walsh and Rice. Thus, the Full Commission finds that plaintiff has shown a change in condition and is entitled to compensation.
18. Based on the testimony and medical records of Drs. White and Charya, and interpreted in the light most favorable to plaintiff, the Full Commission finds that plaintiff has sustained twenty-percent (20%) permanent partial disability to her back.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. A change of condition under N.C. Gen. Stat. § 97-47 is a substantial change in physical capacity to earn wages, occurring after a final award of compensation, different from that existing when the award was made. Bailey v. Sears Roebuck Co., 131 N.C. App. 649,508 S.E.2d 831 (1998). The burden is on the party seeking modification to prove the existence of the new condition and that it is causally related to the injury that is the basis of the award the parties seek to modify.Blair v. American Television Communications Corporation,124 N.C. App. 420, 477 S.E.2d 190 (1996). In the present case, plaintiff has shown through medical records and physician testimony that her diagnosis of cervical radiculopathy subsequent to the initial June 24, 1998, Opinion and Award in this matter was proximately related to her December 18, 1996 work related injury and, thus, constitutes a change in condition pursuant to N.C. Gen. Stat. § 97-47.
2. The Full Commission is not persuaded by defendant's argument that neither Dr. White nor Dr. Charya was in a position to note a change in plaintiff's condition because neither examined her prior to the initial Opinion and Award of the Commission. The Court of Appeals in Styron v.Duke University Hosp., 96 N.C. App. 356, 385 S.E.2d 519 (1989), held that physicians who did not examine an employee prior to an initial award could nonetheless provide evidence necessary to support a finding that the employee thereafter sustained a compensable change in condition. Id. The Court stated:
 "we see no reason to inhibit an applicant's ability to prove a change in condition by limiting proof as to the testimony of a physician who had examined the plaintiff before and after the change in condition. Generally speaking, such physician may be unavailable for testifying during a later hearing for greater benefits. Further, the Commission, not the testifying physician, makes the crucial comparison of conditions."
Styron at p. 520 (emphasis added).
3. As a result of plaintiff's compensable injury by accident, plaintiff is entitled to permanent partial disability compensation benefits for 60 weeks at a compensation rate of $117.09 per week for the 20% permanent partial impairment rating to her back. Such compensation shall be calculated from September 14, 1999, the date the Full Commission finds plaintiff reached maximum medical improvement. N.C. Gen. Stat. § 97-31(23).
4. Plaintiff is entitled to continuing medical compensation for medical treatment and services as may reasonably be required to effect a cure, give relief, or lessen the period of plaintiff's disability. N.C. Gen. Stat. §§ 97-2(19), and 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Due to a change in plaintiff's condition, defendant shall pay to plaintiff permanent partial disability compensation benefits for 60 weeks at a compensation rate of $117.09 per week for the 20% permanent partial impairment rating to her back, subject to the attorney's fee awarded herein. Such compensation shall be calculated from September 14, 1999, the date the Full Commission finds plaintiff reached maximum medical improvement. Because the amount has accrued, defendant shall make payment to plaintiff in one lump sum.
2. Defendant shall provide to plaintiff continuing medical compensation for medical treatment and services as may reasonably be required to effect a cure, give relief, or lessen the period of plaintiff's disability.
3. Defendant shall pay directly to plaintiff's counsel a reasonable attorney's fee of twenty-five percent (25%) of the amount awarded to plaintiff in paragraph 1 of this award. Because the amount has accrued, defendant shall make payment directly to plaintiff's counsel in one lump sum.
This 19th day of May 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/____________ LAURA MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER